UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

AARON CROMARTIE,
    *Plaintiff*,

    v.                            No. 3:21-cv-1236 (JAM)

DEPARTMENT OF CORRECTION,
    *Defendant*.

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Aaron Cromartie claims that the defendant Connecticut Department of Correction ("DOC") fired him from his job for racially discriminatory reasons in violation of Title VII of the Civil Rights Act of 1964. DOC contends that Cromartie was fired for engaging in unprofessional conduct by means of making a hand sign that is associated with gang activity.

DOC has now moved for summary judgment. I conclude that there is a genuine issue of fact to suggest that the DOC official who conducted an investigation of Cromartie's alleged misconduct improperly took Cromartie's race into account in reaching his investigative conclusions. I further conclude that there is a genuine issue of fact to suggest that the investigator played a meaningful role in the termination process so that the investigator's bias is properly attributable to DOC. Therefore, I will deny the motion for summary judgment.

**BACKGROUND**

I draw the following facts from the parties' summary judgment materials. The facts are presented in the light most favorable to Cromartie as the non-moving party, and to the extent that the parties dispute certain facts I adopt Cromartie's version if supported by admissible evidence.

1

Cromartie is African American.[1] He joined DOC as a warehouse supervisor in July 2020, subject to a probationary term known as a "working test period."[2] Before beginning this position, Cromartie attended a pre-service training of several months.[3]

One of the training classes was called "Introduction to Security Risk Groups."[4] DOC currently recognizes 13 Security Risk Groups ("SRGs"), commonly referred to as "gangs," and the class discussed those gangs that are most active within DOC facilities.[5] The class also covered how to differentiate among these groups and identify members so that DOC staff could report any SRG activity up the chain of command.[6] Class participants learned that means of identifying affiliation with an SRG include the display of tattoos, clothing colors, and hand signs.[7]

When Cromartie attended the class in August 2020, it was taught by Captain Daniel Papoosha, a member of the DOC Security Division who serves as the SRG Coordinator.[8] Papoosha presented on four SRGs: the Latin Kings, Bloods, Crips, and Los Solidos.[9] Cromartie asked Papoosha "why he didn't reference any of the [W]hite, Caucasian gangs."[10] Cromartie

---

[1] Doc. #24 at 1 (¶ 2). Title VII protects against discrimination on the basis of national origin (such as being "African American") as well as on the basis of race. *See* 42 U.S.C. § 2000e-2(a). Because Count Three of the amended complaint alleges "race" discrimination, *id.* at 9, this ruling describes Cromartie's claim as one of race discrimination rather than national origin discrimination.

[2] Doc. #78-1 at 1 (¶¶ 1-2).

[3] *Id.* at 1 (¶ 4).

[4] *Id.* at 2 (¶ 5).

[5] *Id.* at 2 (¶¶ 8-9).

[6] *Id.* at 2 (¶ 9). Cromartie claims to dispute that this is the purpose of the class. *Ibid.* Based on the broader disputes in the case, I take him to be refuting the notion that the class's focus is determined *solely* by a neutral determination of which SRGs are the most active. However, he admits this fact later. *See id.* at 3 (¶ 11) ("The [SRG] class focuses on the most active SRG groups within the DOC correctional facilities at the time of the class based on inmate designations into the SRG program. Admitted."). And his point that facility staff can only document the activity levels of groups they are taught how to recognize, *see ibid.*, exceeds the scope of the issues central to this motion.

[7] *Id.* at 4 (¶ 16).

[8] *Id.* at 2 (¶¶ 5-6).

[9] *Id.* at 3 (¶ 12).

[10] Doc. #68-4 at 14. DOC denies that this exchange occurred, noting that Papoosha stated in his deposition that he did not recall Cromartie asking this question. Doc. #68-5 at 28-29. The DOC also maintains that SRGs "are not divided along racial and/or ethnic lines." Doc. #78-1 at 3 (¶ 14).

further alleges that, during the course of the August 4 session, Papoosha used a racial slur, the "N" word, while reciting rap lyrics, which Papoosha denies.[11]

Cromartie graduated from the pre-service training in September.[12] At the graduation ceremony, there were three photographs taken of the graduating student class.[13] In all of them, Cromartie is pictured displaying a hand sign in which he extends his left thumb, index finger, and pinky finger, with his middle and ring fingers turned down.[14]

DOC states that "[h]and-signs of the same configuration . . . were covered in the SRG training class as identifiers used by the Latin Kings and Bloods."[15] Cromartie has maintained since the incident and throughout this litigation that he made the hand sign associated with the Texas Longhorns football team, and he often uses this sign to celebrate, including when he trains quarterbacks as part of his coaching activities.[16]

When the class manager noticed the hand sign in the photos, he reported it up the chain of command.[17] A few days later, Papoosha was assigned to investigate the incident.[18] The following week, he met with Cromartie and a union representative to show him the photographs and obtain a supplemental incident report.[19] Cromartie provided a written statement that included: "In the photograph I displayed a hand sign that represents The Texas Longhorns College Football team which I have been a fan of for over 25 years."[20]

---

[11] Doc. #78-1 at 4 (¶ 18); 68-4 at 13-14.
[12] Doc. #78-1 at 4 (¶ 20).
[13] *Id.* at 4-5 (¶ 21).
[14] *Ibid.*
[15] *Id.* at 5 (¶ 22).
[16] *Ibid.*; Doc. #68-6 at 25.
[17] Doc. #78-1 at 5 (¶ 23).
[18] *Ibid.*
[19] *Id.* at 5 (¶ 24).
[20] Doc. #68-6 at 44.

After this meeting, Papoosha conducted further research and did not find any hand signs used to represent the Longhorns that were similar to Cromartie's; the Longhorns signs extended only the pinky and index fingers, not the thumb.[21] Cromartie admits this fact but notes, as he does repeatedly in the summary judgment filings, that DOC's own training materials state that hand signs are "very hard to distinguish."[22] Indeed, the photos in those training materials depict members of SRGs displaying both the hand sign Papoosha considers the proper Longhorns sign (the "thumb-in" version) *and* the hand sign he deems gang-related ("thumb-out").[23]

Papoosha met again with Cromartie and a union representative in late October.[24] At this interview, Papoosha presented Cromartie with a form stating that "this investigation may lead to disciplinary action, up to and including dismissal if it is determined you engaged in any wrongful act or omission adversely affecting your employment."[25] They discussed the hand sign, and Papoosha asked whether Cromartie recalled a Director instructing the graduating class to remain professional during the photos—Cromartie replied that he did not.[26] The parties agree that, during this interview, Papoosha also asked Cromartie if he was or had been part of a gang.[27] Finally, Papoosha asked why Cromartie wore red in most of his social media photos.[28] Cromartie responded that it was a flattering color.[29] He added that he was an ordained minister and had never been involved in gang activity.[30]

---

[21] Doc. #78-1 at 5 (¶ 25).
[22] *Id.* at 6 (¶ 25).
[23] *Compare* Doc. #69-5 at 122, 137, *with id.* at 214-215 (filed under seal).
[24] Doc. #78-1 at 6 (¶ 26); Doc. #68-6 at 23-32.
[25] Doc. #68-6 at 22.
[26] *Id.* at 25.
[27] *Id.* at 27; Doc. #78-1 at 6 (¶ 28).
[28] Doc. #68-6 at 30.
[29] *Ibid.*
[30] *Id.* at 27.

Papoosha documented the results of his investigation in a written report. He admitted that, based on the interview with Cromartie and a review of his social media, "it is unclear exactly what [Cromartie's] true intention was, when he displayed the hand-sign . . . [H]owever . . . [Cromartie] was in violation of [Administrative Directive] 2.17 (Employee Conduct) when he did so."[31]

Administrative Directive ("A.D.") 2.17 prohibits "[e]ngaging in unprofessional or illegal behavior . . . that could reflect negatively on the Department of Correction . . . to include association or membership with security risk groups."[32] It also requires employees to "[m]aintain appropriate demeanor at all times."[33] Papoosha concluded that Cromartie violated these directives when he "knowingly displayed a hand-sign" that is "a known SRG identifier for the Latin Kings and Bloods . . . . His actions were unprofessional and could negatively reflect on the CTDOC, as the hand-sign was viewed as possibly being SRG related."[34]

Papoosha's report was next referred to DOC Labor Relations for review and a recommendation as to an employment decision.[35] The Labor Relations Specialist at the time, Sarah Fasano-Fernicola, reviewed the investigation report and considered the fact that the Security Division, "as the subject matter experts in SRG group activity, had determined that the hand-sign that the Plaintiff displayed is used by several SRG groups as well as the fact that the Plaintiff was still in his initial six-month working test period."[36] She determined that Cromartie's use of the hand sign was "unprofessional and could reflect negatively on the DOC as any possible SRG affiliation creates serious safety and security risks."[37]

---

[31] *Id.* at 20.
[32] *Ibid.*
[33] *Ibid.*
[34] *Ibid.*
[35] Doc. #78-1 at 8 (¶ 35).
[36] *Id.* at 8 (¶ 37).
[37] *Id.* at 8 (¶ 38).

Fasano-Fernicola drafted a summary and recommendation to "drop" Cromartie during his working test period, which was forwarded to then-Director of Human Resources, Jeffrey Miller.[38] Miller reviewed and concurred with the recommendation.[39]

Cromartie notes that neither Fasano-Fernicola nor Miller conducted any additional investigation of the underlying facts or Papoosha's conclusions.[40] This appears to be by design. As Miller testified in his deposition, it is the responsibility of the Labor Relations department to "verify that the investigation was done completely and consistently with other types of situations that had occurred in the past," and to "review the recommendations from the investigation, not to review the underlying facts, per se."[41] Miller also explained that his role was to review the summary prepared by Labor Relations and make sure he understood the situation: "that the employee had displayed a hand-sign that he should have known could have been interpreted as a gang sign, based on his training."[42] That constituted a violation of A.D. 2.17, "because it was unprofessional behavior, and it absolutely could have had a negative impact on the agency. There's probably nothing more dangerous to our safety and security of the facilities than the security risk group associations."[43]

Cromartie was "dropped"—terminated—during his working test period effective December 4.[44] He requested an administrative review of the decision, which took place in February 2021 and involved convening a panel consisting of an HR specialist, a warden, and an equal employment opportunity specialist.[45] Cromartie and his union representative were

---

[38] *Id.* at 9 (¶ 39).
[39] *Id.* at 9 (¶ 40).
[40] *Id.* at 8 (¶ 35).
[41] Doc. #75-4 at 7-8.
[42] *Id.* at 24.
[43] *Id.* at 24-25.
[44] Doc. #78-1 at 10 (¶ 43).
[45] *Id.* at 10 (¶ 47).

provided an opportunity to present evidence.[46] This included: his admission that he "clearly violated the directive and was not making excuses for his actions"; character letters written on his behalf; a statement that his evaluations had all been positive and he had no prior discipline; information about his active community involvement, including coaching football and church membership; and a reiteration that "this would never happen again."[47] The panel recommended sustaining the termination decision.[48]

After exhausting administrative remedies, Cromartie filed a complaint in this Court, bringing two claims for free-speech retaliation under Conn. Gen. Stat. 31-51q, a race discrimination claim under Title VII, and a retaliation claim under Title VII.[49] Judge Arterton granted DOC's motion to dismiss all but the race discrimination claim.[50] *See Cromartie v. Dep't of Corr.*, 2022 WL 4237072 (D. Conn. 2022). The case was transferred to me, and DOC has now moved for summary judgment on the one remaining claim for race discrimination.[51]

## DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close, contested

---

[46] *Ibid.*
[47] Doc. #68-8 at 16.
[48] *Ibid.*
[49] Doc. #24.
[50] Doc. #44 at 1, 11.
[51] Doc. #68.

issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[52]

### *Title VII race discrimination*

Courts analyze Title VII discrimination claims at summary judgment using the familiar *McDonnell-Douglas* burden-shifting framework. First, Cromartie must establish his *prima facie* case by showing that: (1) he is a member of a protected class; (2) he was qualified for his role; (3) he suffered an adverse employment action; and (4) the adverse action arose under circumstances that give rise to an inference of discrimination on the basis of his protected class. If he carries this burden, then DOC must offer a legitimate, non-discriminatory reason for the adverse action. The burden then shifts back to—and remains with—Cromartie to show that DOC's stated reason is either a pretext or incomplete, such that there remains a genuine fact issue to suggest that DOC's consideration of Cromartie's protected status was a motivating factor for the adverse action. *See Bart v. Golub Corp.*, -- F.4th --, 2024 WL 1281069, at *3-4 (2d Cir. 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

The parties here do not dispute the first three elements of Cromartie's *prima facie* case— that he is a member of a protected class, was qualified for his role, and suffered an adverse action. Rather, DOC contends that Cromartie cannot show circumstances from which a reasonable fact finder could infer discrimination.[53] I do not agree.

Cromartie's burden at this stage is "not onerous"; it is "minimal." *See id.* at *3, *8. He has raised genuine issues with respect to several facts that, if proven, give rise to a *prima facie*

---

[52] Unless otherwise noted and to avoid unnecessary citational clutter, this ruling omits all internal quotations, brackets, and derivative citations for all quotations from cases.
[53] Doc. #68-1 at 5-6.

inference of discrimination. First, he alleges that Papoosha, in his role as a teacher in a classroom, used "the most severe slur in the English language." *Spencer v. Glob. Innovative Grp., LLC*, 2023 WL 6633860, at *10 (S.D.N.Y. 2023); *see also Philip v. Gtech Corp.*, 2016 WL 3959729, at *14 (S.D.N.Y. 2016) (noting that "racist slurs" can support an inference of racial discrimination). As the Second Circuit has observed, the "N" word is an "epithet [that] has been described as a term that sums up . . . all the bitter years of insult and struggle in America, a pure anathema to African-Americans, and probably the most offensive word in English." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) (citation omitted).

DOC argues that this allegation fails to raise a genuine issue of material fact because it "relies entirely on [Cromartie's] own assertion."[54] According to DOC, Cromartie's statements are "devoid of any specifics but replete with conclusions" and thus, are "insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).[55] But Cromartie has alleged facts, not legal conclusions. He testified in his deposition that Papoosha used the slur in the context of reciting a rap song. Papoosha denies using the slur. Thus, there exists a genuine dispute as to a material fact: whether or not Papoosha used a slur that would suggest he harbored racial animus and viewed Cromartie through a race-colored lens.

DOC's "argument against 'self-serving' testimony reflects a misunderstanding of basic summary judgment law" because "to hold that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits." *Peterson v. Conn. Light & Power Co.*,

---

[54] Doc. #84 at 8.
[55] *Id.* at 5.

2014 WL 2615363, at *2 (D. Conn. 2014) (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)); *see also Ortega v. Moran*, 2022 WL 17092584, at *3 (D. Conn. 2022) (same).

Cromartie also alleges that Papoosha only covered Black and Latino gangs in his SRG class, to the exclusion of White gangs. The parties hotly dispute whether racially divided gangs even exist.[56] Thus, there exists a genuine dispute of material fact as to whether Papoosha presented on non-White gangs and, if so, whether that decision was motivated by improper considerations of race. Such animus, if proven, would give rise to an inference of discrimination. At this stage of the litigation, Cromartie has made out his *prima facie* case.

For its part, DOC has met its burden under the second step of the burden-shifting test by offering a legitimate, non-discriminatory reason for Cromartie's termination: during his working test period, he violated a DOC directive by displaying a hand sign that could be mistaken as an SRG identifier.[57]

Therefore, the burden falls back on Cromartie to show that a reasonable jury could conclude that a motivating factor for DOC's decision to terminate his employment was consideration of his race. Importantly, Cromartie does not have to show that DOC's stated reason for terminating his employment was false and a pretext. Even if DOC's stated reason is true, Cromartie may still prevail by showing that this stated reason was not the only reason and that Cromartie's race was also a motivating factor for DOC's termination decision. Thus, as the Second Circuit has noted, "[t]o satisfy the third-stage burden under *McDonnell Douglas* and survive summary judgment in a Title VII disparate treatment case, a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's

---

[56] Doc. #78-1 at 3-4 (¶¶ 14-15).
[57] Doc. #68-1 at 5.

adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Bart*, 2024 WL 1281069, at *8.

And, as the Second Circuit has further observed, this principle may be especially relevant where there is more than one person involved in the decision-making process: "'[T]here are many circumstances in which a jury may justifiably find a prohibited discriminatory motivation notwithstanding a different explanation given by the employer in good faith without intent to deceive,'" and "'[o]ne such circumstance exists where the adverse decision is made by two or more persons, some of whom are motivated by discrimination, while others are motivated by other reasons, and the employer's innocent explanation emanates from those who had no discriminatory motivation and were unaware of their colleagues' discriminatory motivation.'" *Id.* at *10 (quoting *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010)).

In my view, Cromartie's evidence creates a genuine fact issue about whether DOC's proffered explanation for his termination was incomplete (even if not false) and whether a motivating factor in the decision to terminate Cromartie's employment was his race. Cromartie raised a concern about the use of possibly discriminatory content in the class, which Papoosha allegedly dismissed. And Papoosha purportedly used the "N" word during the course of teaching the class. This is enough to suggest that Papoosha took Cromartie's race into account when he was later called on to evaluate the significance of Cromartie's use of a hand sign in the class photograph and to make a recommendation as to whether it violated DOC directives.

Cromartie also points to comparator evidence: DOC's handling of a similar incident involving a Latino employee.[58] This employee was investigated for posting a photo on social

---

[58] I decline to consider his other two proffered comparators. The first individual was dropped during his working test period, and it is undisputed that he was not reinstated. *See* Doc. #78-1 at 11 (¶ 49). Cromartie's proffer as to another officer was not presented during discovery and has not been authenticated. *See* Doc. #84 at 14-15 (elaborating on the proffer's inadmissibility).

media in which he was displaying a hand sign, but he was not terminated.[59] DOC argues that this situation is distinguishable because the individual was a permanent employee (rather than a probationary employee like Cromartie) and because the photos were taken off-duty, not in uniform.[60] But "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 54 (2d Cir. 2014). A reasonable jury could conclude that DOC's more lenient treatment of this employee suggests that what made the difference in Cromartie's case was his race.

The parties dispute whether Papoosha's conduct may be attributed to the DOC. According to the Second Circuit, "'[a] Title VII plaintiff can succeed on a discrimination claim against an employer even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played *a meaningful role* in the decision-making process.'" *Bart*, 2024 WL 1281069, at *9 n.4  (emphasis added) (quoting *Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019); *see also Bickerstaff*, 196 F.3d at 450 (noting "that the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII" and that "[t]his is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process").

Viewing the facts in the light most favorable to Cromartie, there is a genuine issue of fact to suggest that Papoosha played a meaningful role in the termination process. He was assigned to conduct an investigation of Cromartie and in light of his specialized knowledge concerning the

---

[59] Doc. #78-1 at 11 (¶ 50-51).
[60] *Id.* at 11 (¶¶ 50-51); Doc. #85 at 13-14. DOC also argues that the Court should not consider Cromartie's evidence on this point because it relies on unauthenticated hearsay, but DOC itself chose to include the relevant information about this employee in its Rule 56(a)1 statement.

use of gang hand signs and overall prison security. When he interviewed Cromartie, he warned

him that the investigation was for the potential purpose of imposing disciplinary action including

termination. This was not merely a security investigation. Papoosha then filed a report of his

investigative findings and conclusions concerning Cromartie's breach of employee policy, and

this report in turn was referred to DOC Labor Relations for review and a recommendation as to

an employment decision.

The Second Circuit has ruled that an employee who serves an investigative function for

purposes of deciding if there has been a breach of policy may be considered to have a

meaningful role in the decisional process even if the investigator is not a decisionmaker. *See Doe*

*v. Columbia Univ.*, 831 F.3d 46, 58-59 (2d Cir. 2016) (Title IX case applying Title VII principles

and rejecting defendant's argument that bias on the part of an investigator could not be

actionable because "[a]lthough [the investigator] was not the decision-maker, she allegedly had

significant influence, perhaps even determinative influence over the [defendant's] decision" and

"[a]ccording to precedent under Title VII, a defendant institution is not shielded from liability for

discrimination practiced by an employee endowed by the institution with supervisory authority

or institutional influence in recommending and thus influencing the adverse action by a non-

biased decisionmaker").

The parties also dispute whether this case requires application of the so-called "cat's

paw" theory of liability. A "cat's paw" theory of liability "refers to a situation in which an

employee is fired or subjected to some other adverse employment action by a supervisor who

himself has no discriminatory motive, but who has been manipulated by a subordinate who does

have such a motive and intended to bring about the adverse employment action." *Vasquez v.*

*Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016). The court of appeals in

*Vasquez* considered application of a "cat's paw" theory in the particular context of alleged discriminatory conduct by a plaintiff's co-worker who was not her supervisor. The court concluded that the "cat's paw" theory of liability applies "when an employer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision." *Id.* at 275.

The parties next dispute the extent to which negligence is required for cat's paw liability when—unlike in *Vasquez*—the tainting agent is a supervisor. *Cf. Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (noting that, in the Title VII hostile work environment context, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions," but "[i]n cases in which the harasser is a 'supervisor' . . . different rules apply," and "[i]f the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable"). And they seem to dispute whether Papoosha was a supervisor or merely a co-worker with respect to Cromartie.

I do not need to resolve the parties' differences at this time about the potential application of a "cat's paw" theory of liability to this case. That is because, even assuming that a "cat's paw" theory may be one avenue for an employer to be liable under Title VII, it is not the only avenue. Cases like *Bart*, *Naumovski,* and *Bickerstaff* contemplate that the employer may be liable for the acts of an agent who has been assigned or brought in by the employer to assume a meaningful role in the decisional process that culminates in an adverse action such as termination of employment. By contrast, "the 'cat's paw' theory of liability extends an employer's potential liability to circumstances in which there is no evidence that anyone with a 'meaningful role' in the decisionmaking process harbors any impermissible bias." *George v. Pro. Disposables Int'l,*

14

*Inc.*, 2017 WL 4574806, at *3 (S.D.N.Y. 2017); *see also Capella v. Town of Windsor Locks*, 2023 WL 184244, at *6 (D. Conn. 2023) (declining to apply "cat's paw" theory because "Plaintiff has presented sufficient evidence suggesting that Hamel himself played a meaningful role in her termination and, therefore, she need not present evidence demonstrating that Hamel's discriminatory motive could be imputed to *another* decisionmaker").

In short, it is enough for present purposes that there are genuine issues of fact to show that Papoosha had a meaningful role in the termination decisional process and also that he took into account Cromartie's race when investigating and formulating his conclusions in the investigation report. Accordingly, I will deny DOC's motion for summary judgment.

## CONCLUSION

For the reasons stated above, the Court DENIES the defendant's motion for summary judgment.

It is so ordered.

Dated at New Haven this 29th day of March 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge